KOHLER, APPELLEE, *v.* THE BALTIMORE & OHIO RD. CO., APPELLANT.

(No. 3013—Decided November 3, 1944.)

*Mr. Marvin Traxler,* for appellee.
*Mr. Harry S. Manchester* and *Messrs. Harrington, Huxley & Smith,* for appellant.

NICHOLS, J. This cause is in this court upon appeal on questions of law by The Baltimore & Ohio Railroad Company, defendant below, from a judgment rendered against it in the Court of Common Pleas of Mahoning county in favor of Mark C. Kohler, plaintiff below, upon the verdict of a jury and after a remittitur had been ordered by the court.

The action of plaintiff was for damages for alleged rough handling and delay in delivery of a carload of cattle shipped from Kansas City, Missouri, to Youngs-

town, Ohio, on October 29, 1941, the pertinent allegations of plaintiff's amended petition being that "the defendant did not safely deliver the livestock but the cattle were thrown, jammed, and handled in an exceedingly rough manner and were irregularly handled and not delivered according to the contract of delivery in that the shipment was delivered late and as a proximate result of the negligence of the said defendant, the cattle became sick and as a direct result of said negligence thirteen cattle of said shipment died. Said cattle arrived here in Youngstown November 1, 1941, at 2:00 a. m."

Plaintiff further alleged that at the time of delivery of his cattle to the railroad carrier on October 29, 1941, the fifty head of cattle were valued at $2,500; that on arrival in Youngstown the reasonable market value of the fifty cattle was $25 per head, a total of $1,250; "that after arrival thirteen of the cattle died amounting to a loss of $650," the salvage value thereof being $12; and that he sustained a loss and damage "as the result of the gross negligence of the defendant" in the sum of $1,563, for which sum he prayed judgment.

By its answer, defendant admitted that it was a common carrier; that fifty head of stock cattle were shipped from Kansas City, Missouri, stockyards, on October 29, 1941. It denied all other averments of plaintiff's amended petition, specifically denying that it was guilty of any negligence or that the shipment was in any wise roughly or irregularly handled, and alleging that it exercised due and proper care in all particulars in connection with the transportation of such shipment.

For its second defense, defendant denied the shipment was delivered late, alleged it was delivered in accordance with the terms of the uniform livestock contract effective at the time, which provided that "no carrier is bound to transport said livestock by any par-

ticular train or vessel or in time for any particular market, or otherwise than with reasonable dispatch," and averred that the shipment was transported with reasonable dispatch.

For its third defense, defendant set up another provision of the uniform livestock contract, to wit, paragraph (a) of section 1, which provided:

"Except in the case of its negligence proximately contributing thereto, no carrier or party in possession of all or any part of the livestock herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence."

Defendant further alleged that any loss or damage sustained by plaintiff was caused solely and proximately by the natural propensities of the animals and the fault of plaintiff by his agent, the shipper, in procuring the vaccination of the animals with Peter's Hemorrhagic Septicemia Bacterin at a time too close to the time when they were loaded for shipment, which lowered the resistance of the animals to a point where they were unable to withstand the ordinary strain of transportation and became ill with pasteurellosis or hemorrhagic septicemia, and bronchial pneumonia, for none of which defendant was responsible and to none of which it contributed.

For its fourth defense, defendant set forth another of the provisions of the uniform livestock contract, being paragraph (b) of section 1, as follows:

"Unless caused by the negligence of the carrier or its employees, no carrier shall be liable for or on account of any injury or death sustained by said livestock occasioned by any of the following causes: Overload-

ing, crowding one upon another, escaping from cars, pens, or vessels, kicking or goring or otherwise injuring themselves or each other, suffocation, fright, or fire caused by the shipper or the shipper's agent, heat or cold, changes in weather or delay caused by stress of weather or damage to or obstruction of track or other causes beyond the carrier's control.''

Defendant further alleged that any loss or damage sustained to the shipment was caused solely and proximately by the negligence of the shipper in having medication administered to the animals just previous to the shipment and the weather conditions while the shipment was en route, all of which were beyond the control of the defendant.

For his reply, plaintiff denied each and every statement contained in defendant's answer and specifically denied that the shipment was transported with reasonable dispatch.

It may be said here that upon the trial there was admitted in evidence on behalf of defendant the uniform livestock contract covering the shipment and that all of the terms and conditions set up in the various defenses of the answer are shown to be a part thereof.

It is observed that plaintiff does not complain that the car furnished by the shipper was in any manner unsuitable for such shipment or that there was any lack of proper bedding or any failure to provide a period of rest, food or water during the transportation; neither is there any evidence in the record tending to show any failure in such respects.

In charging the jury, the court said:

''Now, it is claimed in the plaintiff's petition the cattle were thrown about and jammed and handled in an exceedingly rough manner. That claim is withdrawn from the jury and you do not consider that claim as the evidence does not warrant your consideration of that claim. The only claim, as I have said, is with

respect to whether or not the delivery was made with reasonable dispatch.''

We are in accord with the action of the trial court in withdrawing the issue of rough handling from the consideration of the jury, there being no evidence in the record to sustain such claim.

Upon the trial, plaintiff offered evidence to the effect that on October 31, 1941, he appeared at the freight office of the defendant in Youngstown and ''reported I had a load of cattle coming this way * * * and I would like for him to send a tracer so that I would know when the cattle would arrive''; that as a result of the tracer sent by the agent he got a report that the cattle would be in Youngstown at 8 o'clock that evening; that pursuant to such report he arrived at the freight station about 8 o'clock, found a night watchman of whom he inquired if he had any orders on the cattle and was told that he did not, but that he could probably call the Haselton yard, the switching yard; that he called an employee of the company at the Haselton yard, who told him ''the cattle were not but they were lost''; that he told defendant's employee he was in to unload them and wondered how soon he could find them, and the employee replied, ''We are looking for them, I don't know when we will find them. Call me back after while''; and that he called back between 11 and 12 o'clock and was informed ''they had not found the cattle.''

Plaintiff testified that the cattle did arrive at 2 o'clock on the morning of November 1, and he and a neighbor he had brought along to help him began unloading. He stated that ''it was a regular cattle car, we opened the doors, the unloading door, and backed the truck in and dropped the loading chute and began loading''; that ''the car was in very bad condition * * * the cattle were wading around in the mire, three or four inches deep and plenty wet''; that there was no

straw and he did not notice any sand; that it required four truck loads to transport the fifty cattle to his home; that he arrived at his home with the last load about 6 o'clock, placed the cattle in his barn and did not see them again for about three hours, at which time he noticed that they were all lying in the straw and were tired and weak, "very much exhausted"; that they had been wet and there was "material" on their bodies (evidently meaning that the cattle were more or less covered with their own manure); and that "from their appearance I would say they were trampled in the car in this mire."

On the morning of November 2, 1941, plaintiff noticed that the cattle had not taken very much of the food he had provided for them. He stated that toward noon he went back to the barn and detected some had loud breathing, called a veterinarian, took their temperatures and began treating them. One of the cattle died while the veterinarian was there on his first trip and twelve others died later on, the last about 90 days after the first.

Plaintiff testified that the fifty cattle cost $2,250 at Kansas City, which sum was presumably the market value of the entire fifty. He was inquired of as to the market value of the cattle at the time they arrived in Youngstown. He first stated that he did not consider a value at that time but subsequently stated, "If I would have to bought them in the condition they were in when I unloaded them—oh, about 20 to 25 dollars" per head.

No other witness testified as to the market value of these cattle at any time, and we observe that no one testified to the market value of the cattle at the time plaintiff claims they should have arrived in Youngstown; neither did anyone testify to the market value of any particular steer either at the time of the shipment or at the time the cattle arrived in Youngstown or at the time plaintiff claims they should have arrived

in Youngstown. Except that the cattle were covered with manure when they were first observed in the car upon arrival at Youngstown and the further fact that they appeared weak and were lying down in the barn of plaintiff after being removed from the car, no one testified to any damage to any of the cattle except those that died subsequent to their arrival in Youngstown.

It is quite apparent from the contract of shipment that there was no duty upon the part of the carrier to see that these cattle did not make manure in the car while en route or to see that they did not lie down in such manure during the trip. The carrier was not required to furnish a chambermaid or valet to see that the cattle were kept clean during the trip. Plaintiff did not choose to accompany the cattle or procure anyone to accompany them.

The evidence is clear to the effect that during a great part of the trip the temperature varied from about 32 degees to 65 degrees Fahrenheit and that it rained a considerable portion of the time these cattle were on the way. For neither the rain nor the temperature was the carrier responsible.

The evidence clearly indicates that the cattle were carried with dispatch from Kansas City to Chicago, where they were removed from the car, placed in pens, allowed to rest for six hours, during which time they were furnished hay and after two hours from their removal from the car were given all the water they desired, and that there was no delay in returning them to the car and proceeding with the journey.

The evidence of defendant, through its managing officers, clearly shows the trains upon which these cattle were shipped, and that the Baltimore & Ohio train carrying them from Chicago to Youngstown was due to arrive in Youngstown at 11:30 p. m., October 31. Defendant's supervisor of freight transportation, having

charge of the records of the movements of all trains of defendant, testified that a car of livestock leaving Chicago at 1:10 a. m., October 31, 1941, was due at Youngstown at 11:30 p. m. the same day. This car arrived at the Haselton yard at 11:20 p. m., October 31, that being the delivery yard for the Youngstown territory. From the Haselton yard of the defendant, it was necessary to move the car of cattle to the team-track delivery point, the evidence further showing that there is no set schedule for such movement "but a movement from two to three hours would be reasonable," so that a car of cattle arriving at the Haselton yard at 11:20 p. m., October 31, would be due on the team-track any time between 1:20 and 2:20 a. m. of November 1.

There is no dispute in the record that these cattle began their journey from Kansas City within an hour or two from the time they were loaded upon the car at that point; that although plaintiff had ordered a 36-foot car for such shipment, the company furnished him a 40-foot car.

The records of the company clearly show that there was no delay, and it is not shown otherwise than that the cattle were sent out from Chicago upon the first available train after the rest period above referred to, such rest period being required by law and the service in connection therewith having been performed by Western Livestock Service. There is no evidence of delay or failure to properly care for these cattle during the rest period at Chicago, so that the claim in this case as to delay in this shipment arises solely from the evidence that the freight agent at Youngstown misinformed plaintiff as to the time the car would arrive at its destination. The record does not show that plaintiff informed the freight agent at Youngstown as to the time the car left Kansas City or the number of the train upon which it was being carried. It seems quite clear that the best and conclusive evidence of the time

this car should have arrived in Youngstown is the evidence given by the supervisor of freight transportation who had before him all details of the shipment.

But let us assume that the car should have arrived in Youngstown at 8 o'clock p. m. on October 31, and that six hours intervened before the car was placed on the unloading track. With all the evidence in this record, we are convinced that there is no foundation for a finding by the jury of negligence on the part of defendant which caused an unreasonable delay in the shipment. The whole record clearly shows that these cattle were carried upon the first trains available; that there was no rough handling of the car or negligence of defendant which gave rise to the cattle contracting the disease from which thirteen of them died. On the contrary, the evidence of four veterinarians is contained in the record, all of whom testified that in the process of shipment cattle get much excited because that is an unusual experience to them; that in the ordinary course of shipment they become weakened, frequently refusing to eat, and their resistance becomes lowered; that the germ which produces the disease from which these cattle died is inherent in cattle at all times; that the disease may be produced by contact with other cattle either on the farm or in the stock pens; and particularly that the symptoms of the disease do not develop immediately and only appear after an inoculation period of not less than two days, three of the veterinarians agreeing that such symptoms would not appear less than four to five days after inoculation.

Plaintiff testified that he had been purchasing cattle at Kansas City for a considerable length of time and had caused considerable shipments of cattle to be made from that city to Youngstown; that he knew cattle became excited in shipment and "drifted," that is, lost weight to the extent of about 10 per cent in transportation; that he knew cattle always become weakened

and their resistance lowered during such transportation; that these were the first cattle he ever had vaccinated before loading at Kansas City; and that he never before had any of his cattle contract the particular disease en route.

The query arises as to whether plaintiff had some information before the cattle left Kansas City that they had been exposed to infection by the disease for which he had them vaccinated upon this particular occasion.

From the evidence, it seems quite apparent that the condition bringing about the death of these cattle or any weakness from which they were suffering as the result of the trip could not have come into existence because of negligence of the carrier. It may well be that because of the rain and the temperature variations the time was not propitious for the shipment of the cattle, but plaintiff selected such time and the defendant cannot be held responsible therefor.

The only delay that could possibly have existed in this shipment arose from the time it took to move this car of cattle from the Haselton yard in Youngstown to the unloading track in that city, and there is no showing that the period consumed in that operation was unreasonable. Certainly it was not delay in that operation which brought about the condition from which a part of these cattle died.

We think it well settled that in an action for damages for delay in shipment, it must be shown that the delay was unreasonable and due to the negligence of the carrier, and that the measure of damages due to delay, as distinguished from damages due to rough handling, is the difference in the market value of the cattle at the time they actually arrived at their destination and their market value at the time they should have arrived. There is no evidence in the record from which the jury could have determined such damage under the prevailing rule.

It is our conclusion that reasonable minds could not arrive at a finding of unreasonable delay upon the part of defendant and that there is no evidence in the record upon which the jury was warranted in finding any damage of plaintiff due to unreasonable delay upon the part of the defendant.

The judgment of the Common Pleas Court is reversed and final judgment entered for the defendant.

*Judgment reversed.*

PHILLIPS, P. J., and CARTER, J., concur.